******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JASMIN I. LUNA
(AC 43097)

Cradle, Alexander and Lavine, Js.

*Syllabus*

Convicted of the crimes of misconduct with a motor vehicle and assault in the third degree, the defendant appealed to this court, claiming, inter alia, that the trial court improperly precluded her from introducing into evidence certain medical records of T, who died after the motorcycle he was operating collided with the defendant's vehicle. The defendant had initiated a left turn into a parking lot, without signaling and while speaking on a cell phone, when she turned her vehicle into the path of the oncoming motorcycle before running over the motorcycle and both T and his passenger, who suffered serious injuries. The defendant gave a sworn statement to the police at the accident scene that she had not been on her cell phone at the time of the crash and later mailed to them a second sworn statement, written with the assistance of her counsel, in which she stated, inter alia, that no cars were in the other lane of travel when she turned into the parking lot and that she neither made nor received any phone calls within twenty minutes before the collision. *Held*:

1. The defendant could not prevail on her claim that the evidence was insufficient for the jury to determine that she acted with criminal negligence, as required for a conviction of both misconduct with a motor vehicle and assault in the third degree; there was sufficient evidence pursuant to which the jury could have found, beyond a reasonable doubt, that the defendant exhibited a failure to perceive a substantial and unjustifiable risk that the manner in which she drove her vehicle would cause T's death when, in a gross deviation from the standard of care a reasonable person would observe in her situation, she did not wait for the motorcycle to pass but, believing that it was not traveling that fast, turned left into its path and drove over the motorcycle and its passengers.

2. The trial court did not abuse its discretion or violate the defendant's constitutional right to present a defense when it precluded her from introducing into evidence a toxicology report that showed that T had five substances in his system twelve hours after the collision:

   a. The defendant's unpreserved evidentiary claim that the report was admissible as a business record was not reviewable: nothing in the record indicated that the defendant ever alerted the trial court that she was making such a claim, and, even if her claim had been preserved for appellate review, it failed, as the court precluded the report on the ground that the defendant did not establish its relevance, the defendant did not provide any testimony concerning the effects the substances may have had on T's ability to operate the motorcycle, which was not a matter of common knowledge of the jurors, the report merely listed the substances without an explanation as to the notation of abnormal for those with a positive value, and there was no way to know from the report the amount of any substance in T's body, when he ingested it or whether it was part of his medical treatment; moreover, admission of the report into evidence would have been prejudicial and likely confused the jury, which would have had to speculate regarding the substances and their effects, if any, on T's ability to operate the motorcycle, and the string of inferences the defendant sought to establish by admission of the report was too tenuous.

   b. Because the trial court did not abuse its discretion in determining that the toxicology report was not relevant and, thus, not admissible, the defendant's unpreserved constitutional claim that the court's evidentiary ruling deprived her of her right to present a defense was unavailing.

3. The defendant could not prevail on her unpreserved claim that the admission into evidence of T's death certificate violated her sixth amendment right to confrontation because the death certificate contained testimonial hearsay; defense counsel waived any objection on confrontation clause grounds by stating that he had no objection when the document was marked for identification and objecting when it was offered as a full exhibit only on the ground that it was more prejudicial than probative.

4. The defendant's unpreserved claim that the trial court violated her constitutional right to conflict free representation was unavailing: the record was inadequate to review the defendant's assertion that the court failed to inquire, sua sponte, into a conflict of interest that defense counsel created when he provided the prosecutor with the defendant's second statement to the police, which made counsel into a potential witness who was unable to object to the admission of the statement into evidence or to argue that he was responsible for it without admitting to his mistake; moreover, there was nothing in the record to indicate that the court reasonably should have known of a conflict, as the statement contained nothing signaling a conflict of interest but, rather, simply provided a description of the incident at issue, and there was never a mention of any purported conflict of interest by any party involved; furthermore, as it was not clear from the record that any conflict of interest existed, the court was correct to rely on defense counsel's lack of an objection and silence as to any conflict of interest in determining that there was no need to inquire.

Argued April 6—officially released September 28, 2021

*Procedural History*

Information, in the first case, charging the defendant with the violations of operating a motor vehicle on a highway with a hand-held telephone or mobile electronic device and operating a motor vehicle without minimum insurance, and with the infraction of making an improper turn, and substitute information, in the second case, charging the defendant with the crimes of misconduct with a motor vehicle and assault in the third degree, brought to the Superior Court in the judicial district of New Haven at Meriden, geographical area number seventeen, where the defendant was presented to the court, *K. Murphy, J.*, in the first case, on a plea of guilty to operating a motor vehicle without minimum insurance; thereafter, the second case was tried to the jury; verdict of guilty; subsequently, the charges of operating a motor vehicle on a highway with a hand-held telephone or mobile electronic device and making an improper turn were tried to the court; judgments of guilty in accordance with the plea, verdict and finding, from which the defendant appealed to this court. *Affirmed.*

*Laila M. G. Haswell*, senior assistant public defender, for the appellant (defendant).

*Kathryn W. Bare*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Roger Dobris*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Jasmin I. Luna, appeals from the judgment of conviction, rendered after a jury trial, of misconduct with a motor vehicle in violation of General Statutes § 53a-57 and assault in the third degree in violation of General Statutes § 53a-61 (a) (3) in connection with a motor vehicle accident in which the defendant's vehicle collided with a motorcycle.[1] On appeal, the defendant claims that (1) the evidence adduced at trial was insufficient to support her conviction, (2) the trial court abused its discretion and violated her sixth amendment right to present a defense by improperly precluding her from introducing into evidence portions of the medical records of the operator of the motorcycle, Kevin Tardiff, (3) the court erred in admitting into evidence Tardiff's death certificate and, in doing so, violated her sixth amendment right to confrontation because the document contained testimonial hearsay, and (4) the court violated her sixth amendment right to conflict free representation when it failed to inquire into the actual conflict of interest created by defense counsel when he provided the state with evidence harmful to the defendant. We are unpersuaded by each of the defendant's claims and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 20, 2017, at approximately 4:30 p.m., the defendant was driving her vehicle in a southbound direction on Old Colony Road in Meriden to attend a baby shower at the Meriden Turner Society (hall). As the defendant was approaching the parking lot of the hall, she noticed her mother waving for her to turn into the parking lot. At the same time, the defendant noticed a motorcycle driven by Tardiff traveling in a northbound direction on Old Colony Road. The motorcycle was traveling in the center of the lane at the speed limit, neither veering nor swerving. The defendant was holding a cell phone in her right hand and speaking into it. The defendant admitted to one of the police officers at the scene that she was using her cell phone for its global positioning system (GPS) function. She looked to the hall on her left, moved her left hand as if to wave to her mother, and initiated a left turn of the vehicle without signaling. The motorcycle, traveling in the opposite direction, skidded for thirty-seven feet before Tardiff "laid the bike down," deliberately dropping the motorcycle to the ground, where it bounced and scraped along the pavement for thirty more feet before striking the defendant's vehicle. The defendant's vehicle drove over the motorcycle, Tardiff and his passenger, Kathryn Caponigro, before coming to a stop "almost all the way into" the parking lot.

Emergency personnel soon arrived to treat the motorcycle operator and his passenger. Tardiff and Caponigro were transported to MidState Medical Center in Meri-

den and later taken via Life Star helicopter to Hartford Hospital. Tardiff died of his injuries approximately two weeks later. Caponigro remained in the hospital for three months, and her injuries seriously affected her walking, speech, and vision.

At the scene of the accident, the defendant gave a statement to Garrett Ficara, an officer with the Meriden Police Department, in which she stated that she had not been on her cell phone at the time of the crash. She also told Lieutenant Thomas J. Cossette, Sr., of the Meriden Police Department that she had been using the GPS capability of her cell phone while driving. An eyewitness who was driving a vehicle directly behind the defendant prior to the crash, Elizabeth Gonzalez-Asik, saw the defendant holding her cell phone, in her right hand, up to her ear and talking into the phone.

Additionally, at the scene, the defendant told Lieutenant Cossette that she saw the motorcycle but did not think that it was coming "that fast." In her written statement, taken by Officer Ficara at the accident scene, the defendant stated that she saw the motorcycle, traveling northbound on Old Colony Road, come over the hillcrest. From behind the defendant's car, Gonzalez-Asik saw the motorcycle coming and thought to herself that the defendant was going to hit the motorcycle because she "knew [that the defendant] didn't see them."

Following a jury trial, the defendant was convicted of misconduct with a motor vehicle and assault in the third degree. She was sentenced to a total effective term of six years of incarceration, execution suspended after three years, followed by three years of probation. This appeal followed.

I

The defendant first claims that the state presented insufficient evidence to support her conviction of misconduct with a motor vehicle and assault in the third degree. Specifically, she argues that the state did not present sufficient evidence regarding the element of criminal negligence as to both offenses. We disagree.

We first set forth our standard of review. "It is well known that a defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . When reviewing a claim of insufficient evidence, an appellate court applies a two part test. . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the verdict. . . . [Second, we] . . . determine whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence

that is circumstantial rather than direct. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . An appellate court defers to the jury's assessment of the credibility of witnesses on the basis of [its] firsthand observation of their conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Thorne*, 204 Conn. App. 249, 256–57, 253 A.3d 1021, cert. denied, 336 Conn. 953, 251 A.3d 993 (2021).

Misconduct with a motor vehicle and assault in the third degree both contain the element of criminal negligence. Section 53a-57 (a) provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person." Similarly, "[a] person is guilty of assault in the third degree when . . . (3) with criminal negligence, he causes physical injury to another person by means of a . . . dangerous instrument . . . ." General Statutes § 53a-61 (a).

General Statutes § 53a-3 (14) defines criminal negligence as the failure "to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." Accordingly, "[u]nder § 53a-57, the state was required to prove that the defendant was operating a motor vehicle, that [s]he caused the death of another person, and that [s]he failed to perceive a substantial and unjustifiable risk that the manner in which [s]he operated [her] vehicle would cause that death. The failure to perceive that risk must constitute a gross deviation from the standard of care that a reasonable person would observe in the situation." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Daniels*, 191 Conn. App. 33, 50, 213 A.3d 517, cert. dismissed, 333 Conn. 918, 217 A.3d 635 (2019), and cert. granted, 333 Conn. 918, 216 A.3d 651 (2019).

The defendant argues that the evidence was insufficient for a reasonable jury to determine that she acted with criminal negligence, as required for a conviction

of both offenses. She contends that "[t]he events of this case occur every day. Everyone who drives knows the feeling of being slightly distracted by problems, conversations with passengers, and trying to get to a destination. . . . [The defendant] suffered a momentary lapse in judgment when she was trying to make a left turn into a place she was not familiar with. She was not criminally negligent . . . ." (Citation omitted.)

In the present case, the evidence was sufficient to support the jury's conclusion that the defendant failed to perceive a substantial and unjustifiable risk while operating a motor vehicle. The defendant, as an operator of a motor vehicle, was "under a duty to exercise reasonable care . . . and to keep a reasonable lookout for persons or traffic that . . . she [was] likely to encounter." (Citation omitted.) *State* v. *Carter*, 64 Conn. App. 631, 642, 781 A.2d 376, cert. denied, 258 Conn. 914, 782 A.2d 1247 (2001). In a gross deviation from the standard of care that a reasonable person would observe in the situation, the defendant, while using her cell phone to attempt to locate her destination, and perhaps while talking on the phone, saw a motorcycle traveling in the opposite direction but did not believe that it was traveling "that fast" and did not wait for it to pass. Rather, without using her turn signal, she turned left into the path of the motorcycle. Despite Tardiff's placing his motorcycle on the ground, where it continued to slide, the defendant *continued to drive* over the motorcycle and its passengers before stopping in the parking lot of the hall. The defendant's lack of attention while attempting to locate and enter the parking lot exemplifies a failure to "perceive a substantial and unjustifiable risk that the manner in which [s]he operated [her] vehicle would cause that death." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Daniels*, supra, 191 Conn. App. 50.

Similarly, in *State* v. *Carter*, supra, 64 Conn. App. 633, the defendant was convicted of misconduct with a motor vehicle for losing visual focus on the road, veering out of his travel lane and killing a motorist standing by a disabled vehicle. On appeal, the defendant claimed that the evidence was insufficient to establish criminal negligence. Id., 636. This court determined that "[w]hether the defendant had been working on something under the dash or had fallen asleep is of little consequence to our analysis. The [trial] court had before it circumstantial evidence as to what caused the defendant to operate his vehicle while bent over and in an erratic manner. The court was free to draw whatever inferences from the evidence or facts established by the evidence it [deemed] to be reasonable and logical." (Internal quotation marks omitted.) Id., 640.

Like the motorist in *Carter* who lost focus on the road, the defendant in the present case was too distracted to perceive the risk created by the manner in

which she was operating her vehicle. See id., 636. On the basis of the evidence presented at trial, the jury reasonably could have concluded that the defendant's actions in utilizing her cell phone, turning in front of the motorcycle, and, ultimately, running over the motorcycle and both its operator and passenger, exhibited a failure to "perceive a substantial and unjustifiable risk that the manner in which [s]he operated [her] vehicle would cause that death." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Daniels*, supra, 191 Conn. App. 50. Consequently, on the basis of our review of the record, we conclude that there was sufficient evidence pursuant to which the jury reasonably could have found beyond a reasonable doubt that the defendant, acting with criminal negligence, caused both the death of one person and physical injury to another by means of a dangerous instrument.[2]

## II

The defendant next claims that the trial court improperly precluded her from introducing into evidence portions of Tardiff's medical records. Specifically, on the first day of evidence she sought to introduce, inter alia, portions of a toxicology report (report) showing that Tardiff "had five illicit substances in his system" at the time of the accident. According to the report, a sample of Tardiff's urine was taken on May 21, 2017, at 4:46 a.m., and was screened for a number of substances.[3] The report does not list any amounts of the substances but merely provides a list of substances with either a positive or a negative value. The substances with a positive value have a notation of "abnormal." The report shows that Tardiff's urine tested positive for Oxycodone, amphetamine, benzodiazepine, cannabinoid, and opiate. The defendant has raised both an evidentiary claim and a constitutional claim regarding the trial court's exclusion of Tardiff's medical records. We address each in turn.

## A

The defendant first claims that the court abused its discretion in declining to admit into evidence Tardiff's medical records. Specifically, she claims that the records were admissible as business records. The defendant acknowledges that she did not say the words "business record exception" at trial but, nevertheless, alleges that her claim regarding the business record exception to the hearsay rule; see Conn. Code Evid. § 8-4; was functionally preserved because "she did subpoena the medical records, along with someone who could attest to the business record exception requirements." The state claims that the medical records contain hearsay and that the defendant raised her claim regarding the business record exception to the hearsay rule for the first time on appeal. Moreover, the state claims that, even if the defendant did preserve this claim, the preclusion of the medical records was proper

because she failed to provide an adequate foundation for their admission under the business record exception and because she failed to establish their relevance to any disputed issues at trial. We agree with the state.

The following additional facts are relevant to our resolution of this claim. Defense counsel sought to admit Tardiff's medical records on the ground that Lieutenant Cossette had "testified about brain response. . . . [H]e received the medical reports and reviewed them; they are part of the investigation. . . . [H]is report says there were no drugs involved. And yet, he had a toxicology report from the hospital that said that there were five illegal substances." The court inquired whether defense counsel would introduce evidence that there were illicit substances in Tardiff's system "at the time of . . . the accident?" Defense counsel answered affirmatively, and the court stated: "I am not guaranteeing that [the investigating officer] can authenticate those documents. . . . You should be prepared to call a witness who can authenticate those documents."

The following day, defense counsel informed the court that he had subpoenaed the custodian of the medical records at Hartford Hospital to appear with the pertinent medical records. The following colloquy took place between the court and defense counsel:

"The Court: . . . Are you intending to call someone to interpret any of the documents that [you] subpoenaed?

"[Defense Counsel]: No. Just to show . . . the toxicology report—

"The Court: Well, how is someone going to be able to—how is the jury going to be able to interpret that?

"[Defense Counsel]: Well—

"The Court: I don't know what's in the toxicology report. I'm just asking you how—how are you going to be able to interpret whatever substances, if any, are in—in . . . Tardiff's system? . . . [I]f you are going to introduce evidence of some type of substances in someone's system, how is the jury going to know what the impact, if any, of those substances are on that person?

"[Defense Counsel]: Well, under these circumstances, they would know the substances were there. They can apply common sense—

"The Court: But, again, how would they know what the impact is? Suppose he had nicotine in his system; what is the impact of that? Suppose he had aspirin in his system; what is the impact of that? Suppose he had cocaine in his system; what is the impact of that?

"It doesn't—I don't know how those—the introduction of the toxicology report is going to be relevant to the jury's consideration all by itself.

"[Defense Counsel]: Well, I'm not going to ask someone who only delivers the paperwork, and authenticates it, to interpret it.

"The Court: Well, then how would it be relevant to this case?

"[Defense Counsel]: Well, I think—

"The Court: If the jury doesn't know anything about the impact of—any of those substances—I've given a list of three—but, any substances are found, how is the jury going to be able to interpret how that impacts on the human body, on the length that it stays in the system. How are [the jurors] going to be able to interpret that?

"[Defense Counsel]: Well, I'm certain that the state will argue that.

"The Court: No. That's not a question of the state. It's a question of relevancy."

The court further stated to defense counsel: "Counsel, you're going to have to make an indication of whatever is about to be introduced tomorrow, if that when we continue the case to, is relevant in this case. You have not made that—you have not shown that yet. There is an objection by the state.

"Essentially, right now, you're asking for a continuance in order to allow for those documents to be provided. I guess what I'm saying is, just introducing the documents, alone, is not sufficient to make them relevant in this case. It may be they are relevant. I don't know. But you haven't made a case yet that they are relevant. . . . As far as any other substances, I don't know what the other substances are. I also don't know when they were administered [or] [w]hether they were the result of medical intervention. I don't know any of that. So, again, you haven't shown that those—the introduction is relevant."

The court also asked defense counsel whether the records indicate "the date of extraction, or the date that the sample was taken." Defense counsel replied that the records indicate that the sample was taken within eighteen hours of Tardiff being admitted to the hospital. The court then asked that the medical records be marked as a court exhibit "so that [it could] examine [the records] in order to rule on the motion regarding [their] admissibility . . . [and] [s]o that [it could] understand . . . how, if at all, [the records were] relevant here."

The next day, when defense counsel did not call any witnesses to testify regarding the medical records, the court stated: "Alright. Well, based on what you've provided to me today . . . I can't—you haven't identified any witnesses. You haven't provided any additional information. . . .

"In regard to the urine screens . . . there are a num-

ber of problems with introducing the urine screens the way they are, without any further explanation. One, based on my knowledge, and it's a limited knowledge, urine does not test—is not as specific as blood, to test what is in a person's system at the time of the test. And I don't know that one can extrapolate backward, the date of the test, in this case, that you're seeking to introduce, is [May 21] . . . at 4:46 a.m., which is approximately twelve hours after . . . the accident. And . . . it's not clear what those substances, in his urine, how they impacted . . . whether they were affecting him, at all? What the nature of the effect was? . . . I have no idea what the impact of those substances [was] at the time of the accident.

"I don't know what the impact of medical intervention was. Whether some, or all, of these substances might have been provided in the course of medical intervention. There [were] twelve hours that had passed—ten to twelve hours—from the time that medical intervention began. There are a number of different types of drugs. I don't know . . . the impact of those different types of drugs. Even assuming that you could show that they would have been in his system, in his blood system, going through his brain, and his heart, and his body, at the time, even if you could show that they were somehow in his system, at the time, I don't know . . . the impact of those [substances]." The court, thus, sustained the state's objection to the admission of the medical records.

In light of our review of the transcripts of the proceedings concerning the court's decision declining to admit Tardiff's medical records, the defendant's claim that the medical records were admissible as business records is problematic for a couple of reasons. First, there is nothing in the transcripts indicating that defense counsel ever alerted the trial court that he was making such a claim. "To admit evidence under the business record exception to the hearsay rule, a trial court judge must first find that the record satisfies each of the three conditions set forth in [General Statutes] § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . To qualify a document as a business record, the party offering the evidence must present a witness who testifies that these three requirements have been met." (Internal quotation marks omitted.) *HSBC Bank USA, National Assn.* v. *Gilbert*, 200 Conn. App. 335, 349, 238 A.3d 784 (2020).

Although defense counsel did subpoena the custodian of the medical records at Hartford Hospital to appear with the pertinent medical records, he never presented a witness to testify regarding the medical

records to establish a foundation for the documents to be admissible as business records. On the basis of the record, we conclude that the defendant did not preserve her evidentiary claim that Tardiff's medical records were admissible as business records. Accordingly, the claim is not reviewable. See *State* v. *Fernando V.*, 331 Conn. 201, 212, 202 A.3d 350 (2019) ("[a]ssigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush" (internal quotation marks omitted)).

Second, even if we assume that the defendant's evidentiary claim regarding the court's preclusion of the medical records was preserved, the defendant's claim, nevertheless, fails. "Once [the criteria of § 52-180] have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried." (Internal quotation marks omitted.) *State* v. *William C.*, 267 Conn. 686, 704, 841 A.2d 1144 (2004); see also *Edward M.* v. *Commissioner of Correction*, 186 Conn. App. 754, 762, 201 A.3d 492 (2018) ("[i]t is axiomatic that, in order to be admissible, evidence must be relevant to an issue in the case in which it is offered" (internal quotation marks omitted)). In the present case, the trial court excluded the proffered medical records on the ground that the defendant had failed to establish their relevance, and we agree with that conclusion.

"It is well established that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Barrett*, 43 Conn. App. 667, 671, 685 A.2d 677 (1996), cert. denied, 240 Conn. 923, 692 A.2d 819 (1997). "As a basic principle, evidence must be relevant to the defendant's theory of the case to be admitted. . . . The proffering party bears the burden of establishing the relevance of offered evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Clifford P.*, 124 Conn. App. 176, 188–89, 3 A.3d 1052, cert. denied, 299 Conn. 911, 10 A.3d 529 (2010). "[A] defendant, when claiming that a court's ruling on relevance and admissibility was improper, bears the initial burden of demonstrating that that ruling was an abuse of discretion." *State* v. *Hernandez*, 91 Conn. App. 169, 173, 883 A.2d 1, cert. denied, 276 Conn. 912, 886 A.2d 426 (2005).

In the present case, the trial court stated to defense counsel numerous times that a witness would be needed

to testify as to the effects, if any, that the substances listed in the toxicology report may have had on Tardiff's system and ability to drive, and that introducing the medical records, alone, was not sufficient to establish their relevance. Specifically, the court explained that it could not discern from the toxicology report, alone, when Tardiff ingested the substances, how long they were in his system, the levels of the substances in his system and the type of impact, if any, on Tardiff, or whether the substances were in Tardiff's system as a result of any medical intervention when he was taken to the hospital. In fact, the toxicology report from Hartford Hospital contains a notation that states that Tardiff tested "positive for cannabinoid—other substances as well but got meds when admitted to [MidState Medical Center]." The report also merely provides a list of substances found in Tardiff's urine with either a positive or negative value and does not list any amounts of the substances.

In *Deegan* v. *Simmons*, 100 Conn. App. 524, 536–39, 918 A.2d 998, cert. denied, 282 Conn. 923, 925 A.2d 1103 (2007), this court addressed a situation similar to the one in the present case. In *Deegan*, the plaintiffs claimed on appeal that the trial court improperly precluded them from introducing evidence demonstrating that the defendant Ollie J. Simmons allegedly tested positive for marijuana at the hospital after a motor vehicle accident involving the parties. Id., 536. Specifically, "[i]n the course of pretrial discovery, it was learned that on the day of the accident, Simmons was taken by ambulance to [MidState] Medical Center in Meriden where a test for a cannabinoid in his system resulted in a finding of 'abnormal.' " Id., 537. The court granted a motion in limine filed by the defendants to exclude the laboratory report. Id. On appeal, this court affirmed the trial court's decision to exclude the report and concluded: "[T]he court correctly noted that there was no evidence that marijuana had been used prior to the accident and no evidence that Simmons was impaired while driving his vehicle. Without corroborating evidence, the laboratory report itself would not explain: (1) how long a cannabinoid substance stays in a person's system; (2) the amount of cannabinoid in Simmons' system at the time of the accident; (3) the relationship between cannabinoid and marijuana; (4) what other products might cause a positive result for a cannabinoid substance; (5) whether urine tests could produce a false positive result and, if so, how often; (6) the possibility for contamination of the sample; and (7) the chain of custody of any sample. These are not subject areas within the common knowledge of the jury and yet each of these factors has evidentiary significance. Thus, the court correctly concluded that the laboratory report indicating an 'abnormal result' for a cannabinoid screen was inadmissible absent explanatory expert opinion." Id., 538; see also id. ("[e]xpert testimony is required when the ques-

tion involved goes beyond the field of the ordinary knowledge and experience of judges or jurors" (internal quotation marks omitted)).

Likewise, in *State* v. *Hargett*, 196 Conn. App. 228, 246–47, 229 A.3d 1047, cert. granted, 335 Conn. 952, 238 A.3d 730 (2020), this court concluded that the trial court properly excluded a toxicology report showing the presence of phencyclidine (PCP) in the victim's body at the time of death, which report the defendant sought to have admitted as a business record.[4] In that case, the defendant "did not disclose an expert to testify or to explain how people behave or act under the influence of PCP or how the victim acted or could have acted under the influence of PCP"; id., 244; nor did he "explain why the presence of PCP in the victim's body was relevant to self-defense and his intent or otherwise lay a foundation for the admission of the toxicology report." Id., 246; see also *Abreu* v. *Commissioner of Correction*, 172 Conn. App. 567, 581 and n.6, 160 A.3d 1077 (court properly excluded evidence of victim's blood alcohol content from autopsy report to show that victim was initial aggressor where defendant failed to present any evidence showing that alcohol caused victim to be more aggressive or level of victim's intoxication, or establishing connection between alcohol in victim's system and his tendency toward aggression), cert. denied, 326 Conn. 901, 162 A.3d 724 (2017).

Similarly, in *State* v. *Lawson*, 99 Conn. App. 233, 235–36, 913 A.2d 494, cert. denied, 282 Conn. 901, 918 A.2d 888 (2007), the defendant was convicted of various crimes in connection with an incident in which his truck collided with a motorcycle driven by the victim, who died from his injuries. In that case, the defendant sought to introduce evidence from an autopsy report that the victim had a trace amount of methadone in his blood at the time of the accident. Id., 246. The court precluded the evidence on the ground that "the effects of a trace amount of methadone on motor skills or judgment must be shown by testimony from a qualified expert." Id., 247. The defendant never presented any testimony regarding the effect of methadone on the victim's ability to operate the motorcycle. Id., 248–49. On appeal, this court affirmed the judgment of the trial court, concluding that "the effect of a trace amount of methadone on the victim would be relevant only if that trace amount affected the victim's ability to operate a motorcycle," and that, because "the effects of a trace amount of methadone on driving impairment is not a matter of common knowledge, experience and common sense," expert testimony was required. Id., 250.

The circumstances of the present case are similar to those in *Deegan*, *Hargett* and *Lawson*. In the present case, notwithstanding the trial court's repeated statements to defense counsel, the defendant did not provide any testimony, expert or otherwise, concerning what

effects, if any, the substances in Tardiff's system may have had on his ability to operate his motorcycle, which was not a matter of common knowledge of the jurors. The report, as in *Deegan*, merely listed substances with either a positive or negative value, and those with a positive value had a notation of "abnormal," with no explanation. There was no way to know from the report alone the amount of any substance found in Tardiff's system, when he may have ingested the substance, whether it was provided to him as part of medical treatment, or whether there was a causal connection between the substances found in Tardiff's system and his ability to operate his motorcycle and avoid the collision with the plaintiff's vehicle. See *State* v. *Hargett*, supra, 196 Conn. App. 245 (trial court properly excluded toxicology report because there was no "causal relationship between the evidence of PCP in the victim's body and the defendant's having shot him"); *Deegan* v. *Simmons*, supra, 100 Conn. App. 539 (laboratory "report did not indicate that Simmons was under the influence of marijuana at the time of the accident, and there was no other evidence adduced at trial that would support a reasonable belief that Simmons was operating his vehicle while he was under the influence of any drug or controlled substance"). The court, therefore, properly concluded that the defendant failed to establish the relevance of the proffered medical records.

Finally, the defendant's claim that the jury could have determined the effects, if any, of the substances in Tardiff's system is unavailing. As this court explained in *Deegan*, "[t]o permit evidence of a laboratory result indicating an abnormal result for a cannabinoid, without any further explanation of that finding, would be highly prejudicial to the defendants" and "would likely have confused" the jury. Id. Because the medical records involved in the present case do not have any values or amounts of the substances and, instead, indicate either a positive or negative value, with a notation of "abnormal" for the substances with a positive value, their admission would have been prejudicial and likely would have confused the jury, which would have had to speculate regarding the substances and their effects, if any, on Tardiff's ability to operate his motorcycle. See *State* v. *Hernandez*, supra, 91 Conn. App. 173 ("[o]ur Supreme Court has stated that courts are not required to admit evidence that is merely speculative"). Without the necessary testimony, the string of inferences that the defendant sought to establish by admission of the medical records alone was too tenuous. See *Masse* v. *Perez*, 139 Conn. App. 794, 806, 58 A.3d 273 (2012) ("trial court . . . properly [excluded] evidence where connection between the inference and the fact sought to be established was so tenuous as to require the [trier of fact] to engage in sheer speculation" (internal quotation marks omitted)), cert. denied, 308 Conn. 905, 61 A.3d 1098 (2013).

Accordingly, the trial court's exclusion of Tardiff's medical records was not an abuse of discretion.

B

The defendant next claims, for the first time on appeal, that the court's evidentiary ruling that the medical reports were not relevant violated her right to present a defense. She acknowledges that the claim is unpreserved and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[5] This claim requires little discussion. This court previously has stated that a "defendant's constitutional right to present a defense does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Galarza*, 97 Conn. App. 444, 464, 906 A.2d 685, cert. denied, 280 Conn. 936, 909 A.2d 962 (2006); see also *State* v. *Cerreta*, 260 Conn. 251, 261, 796 A.2d 1176 (2002) (same); *State* v. *Hargett*, supra, 196 Conn. App. 246–47 (court properly excluded toxicology report where defendant failed to establish relevance of report, and, because "court did not abuse its discretion with respect to its evidentiary rulings . . . [it] did not violate the defendant's constitutional right to present a defense").

Because the trial court in the present case court did not abuse its discretion in determining that the medical reports were not relevant and, therefore, not admissible, the defendant's constitutional claim fails.

III

The defendant next claims that the court erred in admitting Tardiff's death certificate and, in doing so, violated her sixth amendment right to confrontation because the document contained testimonial hearsay. We disagree.

The defendant concedes that this claim is unpreserved and seeks review pursuant to *Golding*. See footnote 5 of this opinion. With respect to the first two prongs of *Golding*, we conclude that the record, which contains the full transcript of the trial proceedings, is adequate for our review and the claim is of constitutional magnitude because it implicates the defendant's sixth amendment right to confrontation. See *State* v. *Castro*, 200 Conn. App. 450, 456–57, 238 A.3d 813, cert. denied, 335 Conn. 983, 242 A.3d 105 (2020). Accordingly, the defendant's claim is reviewable, and, therefore, we next address the defendant's claim under the third prong of *Golding*. See id., 457. The state claims that, because the defendant waived any sixth amendment

claim concerning the admission of the death certificate, her claim fails under the third prong of *Golding.* We agree with the state.

The following additional facts are relevant to the court's analysis of this claim. When Tardiff's death certificate was marked for identification, defense counsel stated that he had "[n]o objection." Additionally, when the state offered the death certificate as a full exhibit, the court asked whether there was any objection, to which defense counsel responded, "I'm going to object. It's . . . more prejudicial than probative." When asked by the court if he had any other objection to the evidence, defense counsel answered in the negative.

"It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution." (Internal quotation marks omitted.) *State* v. *Castro*, supra, 200 Conn. App. 457. "[T]he definition of a valid waiver of a constitutional right . . . [is] the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) Id., 458. "When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. See, e.g., *State* v. *Holness*, 289 Conn. 535, 544–45, 958 A.2d 754 (2008) (holding that defendant waived [claim under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), that trial court improperly admitted recording of conversation in violation of confrontation clause of federal constitution] when counsel agreed to limiting instruction regarding hearsay statements introduced by state on cross-examination); *State* v. *Fabricatore*, [281 Conn. 469, 481, 915 A.2d 872 (2007)] (concluding defendant waived claim when he not only failed to object to jury instruction but also expressed satisfaction with it and argued that it was proper)." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 71–72, 967 A.2d 41 (2009). Additionally, it is well settled that defense counsel may waive a defendant's sixth amendment right to confrontation. See *State* v. *Castro*, supra, 457–58 ("[T]he defendant is deemed bound by the acts of his [or her] lawyer-agent . . . . Thus, decisions by counsel are generally given effect as to what arguments to pursue . . . what evidentiary objections to raise . . . and what agreements to conclude regarding the admission of evidence . . . . Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." (Internal quotation marks omitted.)).

In the present case, it is clear from the record that defense counsel waived any objection on confrontation clause grounds. The record indicates that defense counsel had "[n]o objection" to the marking of the death certificate for identification, and when the state offered the document as a full exhibit, defense counsel objected only on the ground that the evidence was more prejudi-

cial than probative. Even when asked by the court whether defense counsel had any other objection to it, he responded, "no." These statements by defense counsel regarding Tardiff's death certificate are similar to the statements of defense counsel in *State* v. *Castro*, supra, 200 Conn. App. 462, in which counsel indicated that he had " 'absolutely no objection' to the admission of the ballistics report, or to [a witness] testifying to the contents of that report . . . ." Thus, defense counsel's statements "constituted a valid, express waiver of the defendant's sixth amendment confrontation clause claim." Id. "[I]n light of the authority already set forth in our discussion of this claim, the defendant's claim fails under the third prong of . . . *Golding* . . . ." Id.

Because the confrontation clause claim was waived, the third prong of *Golding* is not satisfied. "[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Internal quotation marks omitted.) Id., 457, citing *State* v. *Holness*, supra, 289 Conn. 543.

For the foregoing reasons, we conclude that the defendant cannot prevail on her unpreserved confrontation clause claim.[6]

## IV

The defendant's last claim is that the court "violated [her] right to conflict free representation when it failed to inquire into the actual conflict of interest [her] defense attorney created when he provided the state with evidence that harmed [the defendant]." We are not persuaded by this claim.

The defendant did not raise any objection to defense counsel's representation at trial and requests that her unpreserved claim be reviewed under *Golding*. See footnote 5 of this opinion. The following additional facts are relevant to our analysis of this claim.

A few days following the accident, the defendant sought legal advice from her attorney, who ultimately represented her during the trial. Following this meeting, the defendant mailed a second statement, sworn to and witnessed by counsel, to Lieutenant Cossette at the Meriden Police Department, and asked that this second statement be added to the official police file. She previously had given a sworn statement to Officer Ficara at the time of the accident. In the second statement, the defendant indicated that, while she was stopped at the red light, she sent a "voice text" to her mother. She also stated that "there were no cars in the other lane"

when she turned into the parking lot of the hall. The defendant stated as well that she neither made nor received any phone calls "within [twenty] minutes before [she] got to the hall."

During direct examination of Lieutenant Cossette, the state indicated its intention to introduce the defendant's second statement, which was written with the assistance of her counsel. Outside the presence of the jury, the court asked defense counsel if he had any objection to the second statement coming into evidence, to which defense counsel responded, "[n]o, I don't." The court, defense counsel and the prosecutor engaged in a lengthy discussion regarding the statement, its cover letter from defense counsel, and other statements that were a part of the mailing. During this discussion, the court noted multiple times that it was "going to rely on both parties, for their own strategic reasons, to decide . . . what they're going to have admitted as full exhibits . . . ." Ultimately, defense counsel reiterated that he had "no objection" to the admission of the second statement, and the court admitted it as a full exhibit. The other documents contained in the mailing, the cover letter and a letter regarding the defendant's insurance coverage, were marked for identification only.

The defendant first claims that the following three actual conflicts existed during the trial, which affected defense counsel's representation of her: (1) "[defense counsel] could not object to the admission of the [second] statement or argue that he was responsible for it without admitting to his mistake"; (2) "[defense counsel's] involvement in the [second] statement made him look bad to the jury"; and (3) "[defense counsel] made himself into a potential witness."[7]

The defendant next argues that the court should have, sua sponte, conducted a hearing, to determine whether a conflict of interest existed. The state counters that the court had no duty independently to inquire and that the defendant failed to prove that an actual conflict of interest had an adverse effect on her attorney's representation. This claim fails under the third prong of *Golding* because no constitutional violation exists that deprived the defendant of a fair trial.

The record is adequate to review this claim regarding the defendant's sixth amendment right to counsel, which is of constitutional magnitude. "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 685, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

The following legal principals are relevant in addressing this claim. A "trial court has a duty to explore the possibility of a conflict *when it is alerted* to the

fact that the defendant's constitutional right to conflict free counsel is in jeopardy. . . . The purpose of the court's inquiry . . . is to determine whether there is an actual or potential conflict, and, if there is an actual conflict, to inquire whether the defendant chooses to waive the conflict or whether the attorney must withdraw." (Citation omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Barjon*, 186 Conn. App. 320, 329, 199 A.3d 1119 (2018). "An actual conflict of interest is more than a theoretical conflict. . . . A conflict is merely a potential conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." (Emphasis omitted; internal quotation marks omitted.) *Tilus* v. *Commissioner of Correction*, 175 Conn. App. 336, 349, 167 A.3d 1136, cert. denied, 327 Conn. 962, 172 A.3d 800 (2017). It is well established that there are two instances in which a trial court has a duty to inquire as to the presence of a conflict of interest, namely, "(1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . ."[8] (Internal quotation marks omitted.) *State* v. *Davis*, Conn. , , A.3d (2021).

The defendant contends that when her "[second] statement was admitted [in]to evidence and Cossette read it out loud, it was immediately obvious that the statement was damaging to [the defendant's] case. When Cossette [mentioned] the state's theory that [the defendant] wrote the [second] statement to make herself look better, the trial court should have recognized that [defense counsel] had a conflict of interest. The court should have held a hearing to determine the extent of the conflict . . . ."

There is nothing in the record to indicate that the court reasonably should have known of a potential conflict. A review of the second statement reveals that it contained nothing signaling a conflict of interest; rather, it simply provided a depiction of the incident. Additionally, a review of the record demonstrates that there was never a mention of any purported conflict of interest by any party involved. When evaluating whether a conflict of interest exists, "[i]t is firmly established that a trial court is entitled to rely on the silence of the defendant and his [or her] attorney, even in the absence of inquiry . . . ." (Internal quotation marks omitted.) *State* v. *Gaines*, 257 Conn. 695, 708, 778 A.2d 919 (2001).

"A trial judge cannot be expected to be prescient. He or she cannot, upon the record before the court prior to trial, evaluate all possible trial strategies and conclude that the defendant's attorney has a conflict that would preclude him or her from pursuing the 'best' strategy. . . . Many attorneys assist clients in making [statements to police] . . . . This alone, however, does not create an inherent conflict any more than does the

fact that an attorney represents two defendants in the same trial. . . . Before the trial court is charged with a duty to inquire, the evidence of a specific conflict must be sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel is in jeopardy. The remote possibility that [defense counsel] could have been called as a witness does not constitute a potential conflict of which the court reasonably should have been aware." (Citations omitted; footnote omitted.) *State* v. *Crespo*, supra, 246 Conn. 697.

It was not clear from the record that any conflict of interest existed, and, thus, the court was correct to rely on defense counsel's lack of an objection and silence as to any conflict of interest in determining that there was no need to inquire. See *State* v. *Gaines*, supra, 257 Conn. 708. We conclude that the defendant has failed to point to anything in the record that would establish that the trial court was under a duty to inquire. Accordingly, the defendant's argument fails under the third prong of *Golding*. See *State* v. *Crespo*, supra, 246 Conn. 699.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] We note that the defendant, in two, signed statements in the record, spelled her first name "Jazmin." We use the spelling that is consistent with the operative information.

The defendant also was found guilty by the trial court of the motor vehicle violation of operating a motor vehicle with a hand-held telephone or mobile electronic device in violation of General Statutes (Rev. to 2017) § 14-296aa (b) (1), and of committing the infraction of improper turn in violation of General Statutes § 14-242. Additionally, the defendant pleaded guilty to having committed the infraction of operating a motor vehicle without minimum insurance in violation of General Statutes § 14-213b. The defendant has not challenged her conviction of the foregoing violation or infractions on appeal.

[2] As noted, both offenses of which the defendant was found guilty required the jury to find that she acted with criminal negligence. See General Statutes §§ 53a-57 (a) and 53a-61 (a). The jury reasonably could have found that the defendant caused physical injury to Caponigro by driving her vehicle, a dangerous instrument, in a manner that was criminally negligent. See General Statutes §§ 53a-3 (7) and (8), and 53a-61 (a).

[3] In her appellate brief and at oral argument before this court, the defendant disputed the precise time that the urine sample was collected for testing. She based her claim on the fact that the report contains a comment under the Oxycodone screening result that reads: "[P]erformed at MidState Medical Center . . . ." Relying on that comment, the defendant claims that the report shows that the urine was collected prior to Tardiff's being transported to Hartford Hospital; however, there are no facts in the record to support a finding that the times presented in the report from Hartford Hospital are incorrect. This contention serves only to further solidify the trial court's comments regarding the need for testimony to illuminate the relevancy of the report.

[4] We note that, in *Hargett*, our Supreme Court granted the defendant's petition for certification to appeal as to the following issue: "Did the Appellate Court correctly conclude that the trial court did not abuse its discretion in excluding as irrelevant evidence that the victim was under the influence of [PCP] at the time of the murder . . . ?" *State* v. *Hargett*, 335 Conn. 952, 953, 238 A.3d 730 (2020).

[5] Pursuant to *Golding*, we may review an unpreserved constitutional claim "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and

(4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[6] We note that the defendant is not contesting causation or the fact that Tardiff died of the injuries he sustained in the accident. Therefore, even if we assume the existence of error, the admission of the death certificate as a full exhibit was harmless.

[7] We note that these appear to be claims that counsel's trial strategy was flawed, not that a typical conflict of interest existed.

[8] The first instance is inapplicable, as the present case involves an unpreserved claim.